IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN  DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LINDA KEITH | § | |
| | § | |
| VS. | § | CA No._____ |
| | § | |
| METROPOLITAN LIFE INSURANCE | § | |
| COMPANY, CENTRAL BANK, AND | § | |
| CENTRAL BANK WELFARE BENEFIT | § | |
| PLAN | § | |

## ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

LINDA KEITH, Plaintiff, files this Original Complaint asserting causes of action at law and in equity for relief against Metropolitan Life Insurance Company, Central Bank, and the Central Bank Welfare Benefit Plan, Defendants.

## I.
## PARTIES

1.    Plaintiff, Linda Keith ("Keith"), is a resident citizen of Montgomery County, Texas.

2.    Defendant, Metropolitan Life Insurance Company ("MetLife"), is a domestic or foreign insurance company doing business in various states including in the State of Texas.  It maintains offices and a claims facility in Texas.   It may be served with process by serving its registered agent, C T Corporation System, 350 North St. Paul Street, Dallas, TX  75201, or wherever it may be found.

3.    Defendant, Central Bank, is a financial institution doing business in the State of Texas. It may be served with process by serving its President, Robert Mrlik, 11201 Clay Road, Houston, Texas 77041, or wherever he may be found.

4.    Defendant, Central Bank Welfare Benefit Plan (the "Plan"), is an employee welfare

1

benefit plan of Central Bank. Central Bank is the Plan Administrator and Plan Sponsor. The Plan may be served with process by serving Central Bank's President, Robert Mrlik, 11201 Clay Road, Houston, Texas 77041, or wherever he may be found.

## II.
## JURISDICTION AND VENUE

5.    This action against MetLife, Central Bank and the Plan arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001 *et seq.* This Court has jurisdiction over this action pursuant to 29 U.S.C. §1132(e)(1).

6.    Venue is proper in this District and Division pursuant to 29 U.S.C. §1132(e)(2) because the Defendants maintain business activities in and may be found in this district.

7.    Pursuant to 29 U.S.C. §1132(h), this Complaint has been served upon the Secretary of Labor, Pension and Welfare Benefits Administration at 200 Constitution Avenue N.W., Washington, D.C. 20210 and the Secretary of the Treasury at 111 Constitution Avenue N.W., Washington, D.C. 20024 by certified mail return receipt requested.

## III.
## STATEMENT OF FACTS

8.    This is an action to recover, among other things, life insurance benefits owed on the life of John P. White, the insured. Linda Keith was the beneficiary on John White's Policy. MetLife is the insurer.

9.    John P. White was Vice President of Central Bank for Business Development. He began his employment in 2007 and remained in that position with the bank until he ceased working in 2013.

10.   At the outset of his employment, White enrolled in various benefit programs offered

by the bank. These included a PPO medical insurance, life insurance, accidental death & dismemberment insurance, and long term disability insurance programs offered by Central Bank. The life, accidental death, and long term disability insurance coverages were part of the Group Insurance provided through policies issued by MetLife. These coverages were evidenced by a Certificate of Insurance for the Basic Term Life & Accidental Death and Dismemberment Insurance (the "Basic Life Insurance"), and a Certificate of Insurance for the Disability Income Insurance: Long Term Benefits coverage (the "Disability Insurance"). The Group Policy Number for these coverages was KM 05989767-G. Premium payments for this group insurance were paid by Central Bank as a part of White's compensation.

11.    Toward the end of White's employment, his health deteriorated. He was no longer able to function as the Central Bank's Vice President for Business Development. The last day White worked for Central Bank was March 7, 2013 when he took a leave of absence under the Family Medical Leave Act (FMLA).

12.    Shortly thereafter, on or about March 17, 2013, White applied for long term disability benefits under MetLife's disability policy. On March 26, 2013, White's application for long term disability benefits was approved.

13.    White had been diagnosed with monoplegia and amyotrophic lateral sclerosis (ALS), commonly referred to as Lou Gehrig's Disease. Significantly, the Attending Physician's Statement filed with his disability application noted that the "patient has a chronic, progressive, terminal disease." Central Bank, the Plan, and Metlife were at all times keenly aware of the terminal nature of this debilitating disease.

14.    The Disability Insurance Certificate outlined the terms and conditions upon which

disability coverage would be provided, but it made no mention of or reference to the Life Insurance coverage.

15.   It is readily apparent that John White fully intended to keep and maintain his Basic Life Insurance coverage with MetLife following the onset of his disability leave.  This intent is in part reflected in White's letter dated March 19, 2013 to the human resources office of Central Bank reaffirming his desire not to change the designation of Ms. Keith on his Basic Life coverage.  Exhibit A.  It was further evidenced by a May 9, 2013 inquiry about the "Continued Protection" for the continuation of his Basic Life Insurance coverage.  Exhibit B.

16.   MetLife also contemplated a policyholder might want to keep his Basic Life Insurance coverage following the cessation of employment.  In a rather convoluted, complex and occasionally ambiguous manner, MetLife provided various ways to continue that coverage.

17.   The Basic Life Insurance coverage contained several means of continuing insurance coverage following the end of an insured's employment.

18.   Optional "Portability" permitted the Porting of the Basic Life insurance coverage upon a written request during a specific period of time.  Porting was permitted if, among other things, the insured was on an approved leave of absence and his employment ended due to reasons other than retirement.  It required completion of a request form after notice of the option to Port was given and expired at a maximum of 91 days following the date the insurance coverage ended.  Notice of the option to Port was to be given by the Plan, Central Bank, or MetLife or either of them.  Porting continued the Basic Life Insurance coverage following the termination of employment.

The premium cost for the Ported coverage would be the insured's responsibility.

19.     A second way an insured could continue his Basic Life coverage was to exercise the option to convert the basic life insurance coverage to an individual policy. The option to convert is available when various events occur including when "[y]our employment ends." An application was required within 31 days after the date the Basic Life Insurance coverage ended. As with the Portability option, premium payments for the converted coverage become the responsibility of the insured. As important, neither Porting coverage or converting coverage required evidence of insurability.

20.     A third option available to an insured was the Accelerated Benefit Option ("ABO"). If the insured is terminally ill and, among other things, provides evidence of the terminal nature of his condition, he could request payment of a significant portion of his life insurance before death. The request had to be made before the Basic Life Insurance coverage otherwise ended and could be combined with the insured's conversion of the policy.

21.     Central Bank paid the premiums for the various Plan insurance benefits. Upon the disability of an employee and assuming MetLife accepted the disability claim, no disability payments would be forthcoming for the first 3 months of MetLife's Elimination Period. Thus the disabled insured, now no longer an employee with a regular paycheck, was responsible for the payment of the premiums on his life insurance coverage during that 3 month gap. Central Bank had or may have had a policy of continuing to pay the premiums during this "gap" period, but it was not obligated to do so for a disabled employee according to the Disability Insurance Certificate:

> The Employer has elected to continue insurance by paying premiums for employees who are not Disabled and cease Active Work . . . for any of the reasons specified below:
> •      for the period You cease Active Work . . . due to injury or Sickness, up to 3 months....

22.    The only provision for Central Bank's continued payment of premiums for a disabled former employee was contained in the Basic Life Insurance Certificate section entitled "Eligibility For Continuation Of Certain Insurance While You Are Totally Disabled." The obligation Central Bank assumed is described as follows:

> The Employer has elected to continue insurance by paying premiums for employees who cease Active Work in an eligible class for any of the reasons specified below.  You will be notified by the Employer how much You will be required to contribute.
>
> Insurance will continue for the following periods:
>
> 1.      for the period You cease Active Work in an eligible class due to injury or Sickness, up to 9 months;

23.    This is a version of a waiver of premium provision frequently found in group disability policies to continue coverage upon disability - "premium payment will not be required."  It requires that the insured become totally disabled before age 60, and remain so through the "Continuation Waiting Period" of 9 consecutive months.  At that time, the insured is required to file a claim for this benefit for MetLife to decide if the insured qualifies.

24.    On March 18, 2013, MetLife acknowledged receipt of John White's disability application.  It requested certain information to perfect that claim, provided forms to complete, and advised of the need to apply for Social Security disability benefits. MetLife made no mention in its acknowledgment of policy options that might be employed to keep and maintain White's MetLife life insurance coverage during any

6

period of disability.

25.    On March 26, 2013, MetLife approved White's disability application noting his benefits would begin on June 6, 2013 after the 3 month Elimination Period.  MetLife noted the requirement that White apply for Social Security Disability Insurance benefits the recovery of which would be an offset to his MetLife disability benefits. There was no mention of the policy options for keeping and retaining life insurance coverage during his disability.  No form for conversion, porting or otherwise to continue that coverage.  There was no notice of conditions upon which the premiums for his life insurance would be waived during this disability.

26.    On May 9, 2013, MetLife's Life Waiver Unit responded to an apparent premium waiver claim from White for "continuation of group life insurance."  *Id.*  That claim had apparently been made on April 9, 2013.  The Life Waiver Unit acknowledged the group life insurance plan "includes a provision that continues your coverage while your are not actively at work" and advised a representative "may be in contact" with you in the near future.  *Id.* They also advised that "[n]o action is required from you at this time."  *Id.*

27.    There is no record of any "representative" from the Life Waiver Unit making personal contact with White following this letter.

28.    On May 21, 2013, MetLife's Life Waiver Unit responded directly to White's "claim for Basic Life Continued Protection."   Exhibit C.   They advised the insurance plan required he be totally disabled continuously for 9 consecutive months - the Waiting Period - before he would be eligible for that benefit.  They thus "deferred" making a decision on his claim until the Waiting Period expired on December 9, 2013.  This

letter as with the other was completely silent on other means of maintaining or assuring continuation of his Basic Life Insurance coverage.  Both Life Waiver Unit letters were unsigned form letters.  *Id;* Exhibit B.

29.    The May 21, 2013 Life Waiver Unit letter did not advise White that he did not qualify for Basic Life Continuation Protection under the provision involving the 9 month Waiting Period.  That coverage was limited to insureds whose total disability began before the age of 60.

30.    Central Bank, following White's total disability, continued to make premium payments on his group coverage, including the Basic Life coverage.  It's last payment was made June 1, 2013.

31.    On June 5 or June 15, 2013,  White was formally terminated from his position with the bank.

32.    No notice was given White that Central Bank was going to cease making premium payments on his group coverage on June 1 nor was any warning given that that was the last payment it was going to make.  White was given not notice by MetLife that the July 1 premium payment was not made or was due or past due.

33.    There was no notice given to John White of his right to port his basic life coverage nor had Central Bank or MetLife provided the appropriate "request form" that would have allowed White to seek to port his life insurance coverage from  MetLife.

34.    Neither Central Bank nor MetLife advised White of the conversion option nor supplied him with the "application" to convert his coverage.

35.    Central Bank and MetLife were fully aware John White's condition at the time of his disability was terminal.  On information and belief, neither offered, mentioned or

discussed utilization of the ABO option to secure his Basic Life Insurance benefits at the time or during his disability.

36.     John White died on September 14, 2013.

37.     Shortly after his death, Linda Keith, the beneficiary under the Basic Life policy contacted an agent for MetLife to advise them of his passing and was instructed to submit a death claim.

38.     MetLife upon notice of John White's death issued an internal "Claim alert" noting "Team A to handle [employee] died during waiting period for prem waiver."

39.     Central Bank completed a Life Insurance Claim Form for White's death.  Among other information it provided, it noted "Yes" in response to the question: "Was a Total and Permanent Disability (T&P) or Continued Protection (CP) disability waiver claim ever filed with MetLife for this employee?"

40.     On November 25, 2013, MetLife denied the Keith claim for life insurance benefits. That denial was timely appealed by Ms. Keith.

41.     On May 1, 2014, MetLife denied Keith's appeal.  Keith's appeal was denied, as with the initial denial, because John White was "not eligible for Continuation Eligible Insurance While You Are Totally Disabled" since he was 60 years old at the time of his disability.   In addition, there was no coverage since Central Bank ceased making premium payment for White.  Coverage ended on June 30, 2013 following the last payment of June 1, 2013.

42.     Having exhausted her administrative remedies, Linda Keith now brings this action for equitable relief.

## IV
## CLAIM FOR EQUITABLE RELIEF

43.    Congress designed ERISA to promote the interests of employees and their beneficiaries in employee benefit plans. Plan fiduciaries are obligated to discharge their duties with respect to the plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries.

44.    The ERISA fiduciary duty includes the common law duty of loyalty which requires the fiduciaries to deal fairly and honestly with beneficiaries. It also imposes an affirmative duty on the fiduciaries to convey complete, thorough, and accurate information that is material to a beneficiary's claim and circumstance.

45.    This obligation on fiduciaries includes an obligation to reasonably explain to plan participants and beneficiaries the material terms and conditions of the relevant plan documents and provide them with adequate notice of what they need to do in order to continue the basic life insurance coverage.

46.    Central Bank was the Plan Sponsor and Plan Administrator.  MetLife was the Claims Administrator for the Plan.  Both were fiduciaries obligated to act in accordance with the terms of the Plan and in a manner consistent with their fiduciary obligation to John  White as a Plan participate and Linda Keith, a Plan beneficiary.  John White relied on these defendants to honor his wishes to maintain his life insurance coverage, act prudently in doing so, and give him honest and accurate information material to keeping this coverage as he coped with a terminal illness.  Central Bank and MetLife failed in this regard and breached their fiduciary obligations to White and Keith. Denial of Keith's life insurance claim was in defiance of his expressed desire and

resulted in harm to Keith.  Their respective breaches resulted in the loss of the life insurance benefits provided under the Plan.

47.    At the time John White filed for disability benefits he was not told, on information and belief,  there was no automatic waiver of premiums for the life insurance coverage upon his disability.  Nor was it explained that he would not be entitled to the possible continuation of his life insurance under the "Eligibility For Continuation Of Certain Insurance While You Are Totally Disabled" provision of the Basic Life coverage since he did not qualify for this coverage.

48.    Upon making it known to Central Bank his interest in continuing his life insurance coverage at or near the time of his disability, no effort was made to provide White with a copy of the Plan or Certificate or an Summary Plan Description (SPD) from which he could review his various options.

49.    MetLife did provide, in acknowledging and approving White's disability application, information about that coverage, but provided no information about how he could continue his Basic Life Insurance coverage under the Group Insurance Plan.

50.    MetLife's May 9, 2013 reply to White's claim for continuation of group life insurance was misleading and may have lulled him into inaction.  It came from the MetLife Unit responsible for waiver of premium claims.  It did not identify the "provision" that provided for the continuation of this life coverage.  On information and belief, no "representative" ever follow up on his claim and contacted White as was noted in that letter.  More importantly, he was instructed that "[n]o action is required" on his part - telling him there was nothing for you to do.

51.    MetLife's breach of its fiduciary duty was even more apparent in the Life Waiver Unit's

subsequent May 21, 2013 letter.  It was inaccurate, misleading and a misrepresentation of the facts.  MetLife advised White he had to wait 9 consecutive months before coming "eligible" for the Basic Life Continuation Protection benefits - the "Waiting Period".  He would thus not be eligible for those benefits until December 9, 2013.  This was not true.  He was not and would never be eligible for that waiver of premium benefit since he was 60 years old at the time of his disability.  That excluded him from coverage.  Both MetLife and Central Bank knew or should have known of this circumstance.  Neither informed White of this circumstance or corrected any misconception he might have had of his entitlement to this benefit.  White was likely lulled again into inaction upon being advised his claim would be placed in a "pending status" until the expiration of the 9 month "Waiting Period."  He was mislead into believing his coverage would be forthcoming after that Waiting Period.  Neither letter inform White of the requirement that premiums still needed to be paid regardless of his eligibility for Basic Life Continuation Protection benefit.

52.    Not only is the fiduciary obligated to convey accurate material information, it also has an affirmative obligation to correct a participant's incorrect information or misunderstanding of the terms of the Plan or coverage options.

53.    On May 21, 2013, there was still time for White to Port his coverage or convert his life insurance coverage had MetLife accurately and honestly advised White he did not qualify for and was not eligible for the waiver of premium under the Basic Life Continuation Protection provision.

54.    Central Bank paid several months of premiums on John White's group life coverage. Its last payment was on June 1, 2013 resulting in a lapse of the basic life coverage the

first of July, 2013.  Central Bank gave no warning to John White of this final payment nor other notice that would have permitted him to pick up that coverage.  This was in spite of an obligation Central Bank assumed to continue paying premiums for "up to 9 months."

55.   On June 1, 2013, there was still time for John White to pay the insurance premium had Central Bank given him notice or a warning that it was no longer going to pay those premiums or supplied notice of the option to Port his coverage or an application to convert his life insurance.

56.   Central Bank committed to "paying premiums for employees who cease Active Work due to injury or Sickness" for "up to 9 months."    That 9 month period ended in December.  White died 7 months following the onset of his disability.  There was no warning, notice or explanation for terminating premium payments short of this 9 month period.

57.   John White was officially terminated as an employee of Central Bank on or about June 5, 2013.  MetLife informed Central Bank that White had to convert his life coverage in order to keep it beyond the date of his termination.  Neither MetLife nor Central Bank informed White of this requirement to keep his coverage.

58.   Three months later John White was dead.  The claim for the basic life insurance benefits by his designated beneficiary, Linda Keith, was denied.  No life insurance benefits were paid because of these and other breaches of the fiduciary obligations of MetLife and Central Bank.

59.   Linda Keith thus seeks appropriate equitable relief from the fiduciary breaches of Central Bank and MetLife.  This relief includes, but is not limited to (1)  an equitable

surcharge for  unjust enrichment to recover the benefits withheld and to make the

ERISA beneficiary whole, (2) reformation of the Plan to the extent needed to equitably

address and pay her claim, and (3) waiver or equitable estoppel preventing MetLife

and Central Bank from relying on the failure to pay premiums as grounds for denying

her claim.  Keith seeks  any other equitable relief the Court deems necessary and

proper to protect her from a loss from such violations, all pursuant to 29

U.S.C.§1132(a)(3).

## V.
## STANDARD OF REVIEW

60.   The default standard of review for denial of a benefit claim is *de novo.* Where the Plan

or policy confers discretion on the Claims Administrator, an abuse of discretion

standard of review may apply.

61.   The both the Basic Life Insurance and the Disability Insurance coverages contain

discretionary clauses affording MetLife discretion to determine eligibility for benefits

and to construe the terms of those policies.  MetLife's denial under this standard of

review was an abuse of discretion.  It was arbitrary and capricious.

62.   If discretion applies, the Court should afford MetLife less deference in light of its

financial conflict of interest. MetLife's conflict of interest is both structural and actual.

Its structural conflict results from its duel role as the adjudicator of the Keith's benefit

claim and as the potential payor of that claim.  Its actual financial conflict is revealed

in the policies, practices, and procedures influencing and motivating claim denials for

financial gain.  It is also revealed in the high ROE gained from the denial of this and

other similar claims. Each, on information and belief, was a motivation for the denial

of the Keith claim along with its denial of other life insurance claims.  MetLife, in light

of its financial conflict, should be accorded little or no discretion in its decision to deny the Keith claim.

63.     Review of the claims decision in this action should not be on a discretionary basis in light of the nature of this claim.  The fiduciary obligations burdening both MetLife and Central Bank exist regardless of any grant of discretionary authority.  The fiduciary's obligations, among the highest duties under the law, mandate loyalty and fidelity to the Plan participants and Plan beneficiaries.  The decisions and conduct in this action were not discretionary decisions but were breached upon the failure to meet the fiduciary standards of conduct.

64.     Alternatively, the standard of review of this claim should be *de novo* giving MetLife no discretion in its interpretation of the terms of the policies and Plan, nor in its factual determinations.

65.     These policies were  delivered in Texas and as such , subject to the laws of the State of Texas.  Texas has banned the use of discretionary clauses in insurance policies issued in this state.   Tex. Ins. Code, §1701.062; 28 Tex. Admin. Code §3.1202.  Accordingly, review of the Keith claim and MetLife's claims handling conduct both in its interpretation of terms of the policies and the Plan, its determination of eligibility for benefits, and in its determination of the facts should be *de novo* in accordance with Texas law.

## VI.
## <u>CLAIM FOR ATTORNEYS FEES & COSTS</u>

66.     Linda Keith seeks an award of her reasonable attorneys' fees incurred and to be incurred in the prosecution of this claim for benefits.  Keith is entitled to recover those fees together with her costs of court pursuant to 29  U.S.C. §1132(g).

## VII.
## PRAYER

67.     Linda Keith, Plaintiff, respectfully prays that upon trial of this matter or other final

disposition, this Court find in her favor and against Defendants Metropolitan Life

Insurance Company, Central Bank, and the Central Bank Welfare Benefit Plan, and

issue judgment against such defendants on the grounds and for the reasons asserted

in this action.  Plaintiff further requests such other and further relief at law or in

equity to which she may be justly entitled.

Respectfully submitted,


By:_____
James C. Plummer
TBA #16075700
Federal I.D. No. 3692
**PLUMMER|RAVAL**
4203 Montrose Boulevard
Suite 270
Houston, Texas 77006
(713) 522-2887
(713) 522-3605 (Fax)
jplummer@plummerlawyers.com

ATTORNEYS FOR PLAINTIFF
LINDA KEITH


OF COUNSEL:

Amar Raval
TBA #24046682
Federal I.D. No. 619209
Plummer & Associates
4203 Montrose Boulevard, Suite 270
Houston, Texas 77006
(713) 522-2887
(713) 522-3605 (Fax)
araval@plummerlawyers.com