IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION


LINDA KEITH,                          §
                                      §
            Plaintiff,                §
                                      §
v.                                    §
                                      §   CIVIL ACTION NO. H-15-1030
METROPOLITAN LIFE INSURANCE           §
COMPANY, CENTRAL BANK, and            §
CENTRAL BANK WELFARE BENEFIT          §
PLAN,                                 §
                                      §
            Defendants.               §


## MEMORANDUM OPINION AND ORDER

     Plaintiff, Linda Keith, brought this action against defendants,

Metropolitan Life Insurance Company ("MetLife"), Central Bank, and

Central Bank Welfare Benefit Plan, for breach of fiduciary duty

under the Employment Retirement Income Security Act ("ERISA"), 29

U.S.C. §§ 1001, et seq.  The case was tried to the court on May 15

and May 16, 2017.  After carefully considering the evidence and the

parties' arguments, the court makes the following findings of fact

and conclusions of law pursuant to Federal Rule of Civil Procedure

52(a)(1).


### I.   Factual Background[1]

     Linda Keith met John P. White in 1995.  White was a customer

at a restaurant Keith then owned and operated.  The two became

_____

     [1]Unless otherwise indicated, these facts are taken from the
Admissions of Fact section of the Joint Pretrial Order, Docket
Entry No. 53, pp. 11-15, or from trial testimony.

close friends and remained so until White's death in 2013. White was a regular at Keith's restaurant and sought Keith's occasional assistance in an unsuccessful business venture.

After White closed his business he was hired by Advantage Business Capital ("Advantage"), a subsidiary of Central Bank. White served as Vice President of Business Development for Advantage from 2008 until 2013. Advantage had fewer than 20 employees, and Central Bank had fewer than 100 employees. White's responsibilities included soliciting customers for Advantage's factoring services. As part of his job White was required to pre-qualify customers, which involved reading and understanding complex financial documents.

Central Bank was Plan Administrator of the Central Bank Welfare Plan, which provided Central Bank employees with a number of benefits -- including health insurance, supplemental insurance, an employer-matched § 401(k) plan, and life insurance. Descriptions of these benefits were made available to employees online and at annual open enrollment meetings. A life insurance policy covering up to two times the employee's salary was provided at Central Bank's expense.[2] White's ending annual salary was approximately $51,500, giving him $103,000 of life insurance coverage.

From 2008 to 2013 White designated Keith as the beneficiary of his life insurance policy several times. In 2012 White did not

---

[2]Certificate of Insurance, Plaintiff's Ex. 4, p. 19.

designate a beneficiary.[3]  Unbeknownst to Keith, White also
designated his checking account payable on death to her.  During
his employment with Central Bank White never purchased supplemental
insurance, participated in the employer-matched § 401(k) plan, or
elected to increase his life insurance coverage at his own expense.

In 2010 White began to complain of difficulties using his left
hand.  White was eventually diagnosed as suffering from monoplegia
and amyotrophic lateral sclerosis (ALS), commonly known as Lou
Gehrig's disease.  As White's physical condition deteriorated, he
could no longer perform his job duties at the bank, and a mutual
decision was made for White to take a leave of absence.  White's
last workday at the bank was March 7, 2013, after which he began a
leave of absence under the Family Medical Leave Act (FMLA).
Central Bank continued to make premium payments for White's group
insurance coverages, including his life insurance, while White was
on leave.

Central Bank's long-term disability (LTD) benefits provider
and claims administrator was MetLife.  On March 17, 2013, White
applied for LTD benefits under MetLife's policy.  On March 18,
2013, MetLife acknowledged receipt of White's disability
application, requested additional information needed to perfect the
claim, and advised White that he needed to apply for Social
Security disability (SSD) benefits.

--------

[3]Guardian Insurance Application, Central Bank's Ex. 5, p. 2.

On March 19, 2013, White met with Central Bank's Vice President and Human Resources Manager, Judy Rogers, to discuss his benefits. Rogers confirmed that White wanted to make no changes to his benefits. White reaffirmed his designation of Keith as beneficiary of his life insurance policy. Rogers discussed with White the option of maintaining his life insurance policy after termination at his own expense. Rogers told White that Central Bank would make premium payments on the policy through June 1, 2013, after which White would need to make the payments.[4] White said that he was not interested in maintaining his life insurance policy after his termination, and Rogers therefore did not provide him with the paperwork necessary to do so.[5] Central Bank did not then or at any later time provide White with individual written notice of his right to maintain his life insurance policy. In a March 21, 2013, email, Rogers advised White that after June 30, 2013, he would be responsible for his own health insurance but made no further mention of life insurance.[6]

After White ceased working Rogers continued to assist him with claims for LTD benefits and SSD benefits. On March 20, 2013, White

---

[4]Documents and testimony establish to the court's satisfaction that White's monthly cost to convert the Policy to an individual policy was $448.93.

[5]The court finds credible Rogers' account of the March 19, 2013, meeting with White and her stated basis for not providing White with the paperwork for porting or converting his policy.

[6]Plaintiff's Ex. 47.

was interviewed by a MetLife Claim Specialist.[7]  White complained about the MetLife representative to Rogers, who then complained to MetLife and subsequently offered to act as a liaison between MetLife and White, instructing MetLife to communicate through her to avoid burdening White.[8]

White was in frequent contact with both Rogers and MetLife in the months before his death.  On March 22, 2013, a MetLife Claim Specialist spoke with White.[9]  Rogers emailed White later that day.[10]  White emailed Rogers on March 25, 2013, to notify her that he would be "visiting with Social Security" that week and that he had received the paperwork from MetLife.[11]  On March 26, 2013, MetLife approved White's application for LTD benefits and advised White that his LTD benefits would begin on June 6, 2013, after a three-month elimination period.[12]  White, although not actively working, was to remain employed by Central Bank through June 5, 2013.  During this time he used the remainder of his vacation and leave time.

--------------------

[7]MetLife Claim Activity Record, Plaintiff's Ex. 34, pp. 7-14.

[8]Id. at 14-15.

[9]Id. at 32-33.

[10]Central Bank's Ex. 17-A.

[11]Central Bank's Ex. 19.

[12]MetLife Claim Activity Record, Plaintiff's Ex. 34, p. 33.

On April 9, 2013, MetLife internally generated a claim for continuation of group life insurance for White.[13]  On May 9, 2013, MetLife sent a letter ("the May 9th letter") to White acknowledging "receipt" of the April 9, 2013, claim.[14]  MetLife's May 9th letter stated that White's group life insurance plan included "a provision that continues your coverage while you are not actively at work," advised White that a representative "may be in contact" and that "[n]o action" was required from White at the time.[15]  MetLife did not send the May 9th letter to Central Bank.

On May 21, 2013, MetLife again wrote to White ("the May 21st letter"), this time copying Rogers, stating that his insurance plan required him to be totally disabled continuously for nine consecutive months before he would be eligible for continuation of

---

[13]Plaintiff's Ex. 26, p. 1.

[14]Id.  Despite admitting in its earlier briefing, and in the Admissions of Fact section of the Joint Pretrial Order (Docket Entry No. 53, p. 14), that MetLife "sent" letters to White, MetLife now contends that Keith failed to prove the letters were actually mailed to White.  The Fifth Circuit "ha[s] recognized that '[p]lacing letters in the mail may be proved by circumstantial evidence, including customary mailing practices used in the sender's business.'"  Custer v. Murphy Oil USA, Inc., 503 F.3d 415, 420 (5th Cir. 2007) (citing Wells Fargo Business Credit v. Ben Kozloff, Inc., 695 F.2d 940, 944 (5th Cir. 1983)).  The court finds the circumstantial evidence in this case, including MetLife's system notes (Plaintiff's Ex. 33) and Rogers' receipt of a copy of the May 21st letter, sufficient to prove that both letters were sent and therefore, presumptively, received by White.  See United States v. Ekong, 518 F.3d 285, 287 (5th Cir. 2007) (citing Beck v. Somerset Technologies, Inc., 882 F.2d 993, 996 (5th Cir. 1989)).

[15]Id.

group life insurance coverage during his absence from work.[16]  The
May 21st letter also stated that MetLife would defer making a
decision on White's claim for continuation of group life insurance
until December 9, 2013, when the nine-month waiting period
expired.[17]  Neither the May 9th nor the May 21st letter mentioned
the need to convert White's life insurance policy or that White
could not qualify for continuation of life insurance coverage
because he had not become totally disabled before reaching the age
of 60.[18]

On May 28, 2013, MetLife contacted White regarding his LTD
insurance.[19]  The same day Rogers[20] called MetLife to "get an
understanding of the meaning" of the May 21st letter and was told
that White would need to convert his life insurance to an
individual policy in order to maintain coverage during the waiting
period.[21]  Rogers did not provide this information to White, and
there is no evidence that White inquired about either the May 9th

---

[16]Plaintiff's Ex. 26, p. 2.

[17]Id.

[18]See Certificate of Insurance, Plaintiff's Ex. 4, p. 37
("Total disability must start before You attain age 60 . . .").

[19]MetLife Claim Activity Record, Plaintiff's Ex. 34, p. 42.

[20]The court's earlier Memorandum Opinion and Order (Docket
Entry No. 48) at page 14 mistakenly stated that "White" contacted
MetLife on May 28.

[21]MetLife Claims Comment List, Plaintiff's Ex. 33, p. 5.

or the May 21st MetLife letter or about any options pertaining to his life insurance policy.[22]

White was formally terminated from his position with Central Bank at the end of his FMLA leave on June 5, 2013. Central Bank made its final payment on White's life insurance policy on June 1, 2013. White's life insurance coverage ended on June 30, 2013. MetLife's first LTD payment to White was made by check in the latter part of June 2013. Throughout the month of June, White, Rogers, and MetLife communicated to set up direct deposit of White's LTD payments.

White continued to participate in the benefits process. On July 24, 2013, White drove to the bank to drop off papers for Rogers. White emailed Rogers the following day to say that he had forgotten to give her some documents.[23] MetLife's final communication with White was on September 5, 2013, regarding a reduction of his SSD insurance payment.[24]

White was found dead on September 14, 2013. Shortly thereafter, Keith notified MetLife of White's death and MetLife instructed her to submit a death claim. On November 25, 2013, MetLife denied Keith's claim for life insurance benefits.[25] Keith

---

[22]The court finds credible Rogers' testimony that she continued to operate under the belief that White was not interested in paying for life insurance benefits.

[23]Plaintiff's Ex. 50.

[24]MetLife Claim Activity Record, Plaintiff's Ex. 34, p. 59.

[25]MetLife denial letter to Linda Keith, Plaintiff's Ex. 27.

appealed the denial of her claim. On May 1, 2014, MetLife denied Keith's appeal because White's coverage ended on June 30, 2013, following the last premium payment on June 1, 2013, and because White was not eligible for continuation of his insurance since he was 60 years old when he became disabled.[26] Keith filed her Original Complaint against defendants on April 21, 2015.[27]

## II. <u>Applicable Law</u>

An individual plan beneficiary may bring suit for equitable relief for breach of a fiduciary duty under ERISA's so-called "catch-all" provision, which provides:

> A civil action may be brought . . . (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan[.]

29 U.S.C. § 1132(a)(3). To recover "appropriate equitable relief," a plaintiff "must establish that the defendant is (a) a plan fiduciary, (b) has breached its fiduciary duties under ERISA, (c) that such a breach caused the plaintiff's injury, and (d) that the equitable relief sought is indeed appropriate." <u>Shonowo v. Transocean Offshore Deepwater, Inc.</u>, Civil Action No. 4:10-cv-1500, 2011 WL 3418405, at *5 (S.D. Tex. Aug. 3, 2011) (citing <u>Brosted v.</u>

---

[26]MetLife denial-of-appeal letter to Linda Keith, Plaintiff's Ex. 36.

[27]Docket Entry No. 1.

-9-

<u>Unum Life Insurance Company of America</u>, 421 F.3d 459, 465 (7th Cir. 2005) (other citations omitted).

## A.   Fiduciary Status[28]

The threshold question in an ERISA claim for breach of fiduciary duty "is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." <u>Pegram v. Herdrich</u>, 120 S. Ct. 2143, 2152-53 (2000). "[T]he issue of ERISA fiduciary status is a mixed question of fact and law." <u>Reich v. Lancaster</u>, 55 F.3d 1034, 1044 (5th Cir. 1995). Under ERISA, one is a fiduciary to the extent that:

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). In short, "[a] fiduciary within the meaning of ERISA must be someone acting in the capacity of manager

---

[28]The court is aware that fiduciaries under the Plan owe a duty to both participants and non-participant beneficiaries. Because the alleged harm is the loss of benefits under a life insurance policy issued to White for the benefit of Keith, their benefits were aligned, and no further distinction need be made between acting for White's benefit or for Keith's.

[or] administrator." Pegram, 120 S. Ct. at 2151. Merely performing administrative duties as required by the plan is not a fiduciary function. See 29 C.F.R. § 2509.75-8; Walker v. Federal Express Corp., 492 F. App'x 559, 565 (6th Cir. 2012); Barrs v. Lockheed Martin Corp., 287 F.3d 202, 207 (1st Cir. 2002); Plumb v. Fluid Pump Service, Inc., 124 F.3d 849, 854-55 (7th Cir. 1997).

## B. Breach of Fiduciary Duties

ERISA Section 404(a) specifies that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and their beneficiaries," and "for the exclusive purpose of: (i) providing benefits to participants; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). Such duties shall be discharged "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." Id. § 1104(a)(1)(B). "Other than including these general dictates, ERISA does not expressly enumerate the particular duties of a fiduciary, but rather relies on the common law of trusts to define the general scope of a fiduciary's responsibilities." Martinez v. Schlumberger, Ltd., 338 F.3d 407, 412 (5th Cir. 2003) (internal quotation marks omitted). "A trustee has a duty in dealing with a beneficiary to deal fairly and to communicate to the beneficiary

all material facts the trustee knows or should know in connection with the matter." RESTATEMENT (THIRD) OF TRUSTS § 78 (2007).

Fiduciaries who gratuitously communicate with plan participants may owe a duty to "do so in a manner calculated to avoid confusion and misunderstanding, whether by omission or commission." See Switzer v. Wal-Mart Stores, Inc., 52 F.3d 1294, 1298-1299 (5th Cir. 1995) (holding that the Fifth Circuit "d[id] not necessarily disagree" with the district court's implication). Other circuits have held that a "fiduciary may not, in the performance of [its] duties, 'materially mislead those to whom the duties of loyalty and prudence are owed.'" Adams v. Freedom Forge Corp. 204 F.3d 475, 492 (3d Cir. 2000). Fiduciaries have "not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful." Unisys Corp. Retiree Medical Benefits Erisa Litigation v. Unisys Corp., 579 F.3d 220, 227 (3d Cir. 2009) (quoting Bixler v. Central Pennsylvania Teamsters Health & Welfare Fund, 12 F.3d 1292, 1300 (3d Cir. 1993)).

C.    Harm/Detrimental Reliance

If a fiduciary breaches a fiduciary duty, the plaintiff must prove that the breach caused the plaintiff's injury in order to be entitled to equitable relief. Shonowo, 2011 WL 3418405 at *5. "The Fifth Circuit has not squarely addressed what an ERISA beneficiary must establish to recover for misrepresentations by a

fiduciary, but . . . to recover under an equitable estoppel theory, an ERISA beneficiary 'must establish a material misrepresentation, reasonable and detrimental reliance upon the representation, and extraordinary circumstances.'" Continental Insurance Co. v. Dawson, No. 3:13-cv-04150-M, 2017 WL 1196857, at *6 (N.D. Tex. March 31, 2017) (citing Weir v. Federal Asset Disposition Association, 123 F.3d 281, 290 (5th Cir. 1997)). Fifth Circuit case law consistently and "strongly suggest[s] materiality and detrimental reliance are required in the Fifth Circuit for an ERISA beneficiary to recover for a breach of fiduciary duty." Id. The Seventh Circuit has held that "a plaintiff must demonstrate that: (1) the defendant was 'acting in a fiduciary capacity;' (2) the defendant made 'affirmative misrepresentations or failed to adequately inform plan participants and beneficiaries;' (3) the misrepresentation or inadequate disclosure was material; and (4) the plaintiff detrimentally relied on the misrepresentation or inadequate disclosure." Unisys, 579 F.3d at 228.

## III. <u>Analysis</u>

A. **MetLife**

1. <u>Fiduciary Status</u>

Keith argues that MetLife acted as a fiduciary when it generated a claim on White's behalf and initiated gratuitous communication with him regarding that claim. MetLife argues that it was acting merely as claims administrator for the Central Bank

Plan and not as a fiduciary. Ordinarily, "[a] third-party administrator who merely performs ministerial duties or processes claims is not a fiduciary." Reich, 55 F.3d at 1047. "[A] person who performs purely ministerial functions such as [processing of claims] for an employee benefit plan within a framework of policies, interpretations, rules, practices and procedures made by other persons is not a fiduciary." 29 C.F.R. § 2509.75-8. This is "because such person does not have discretionary authority or discretionary control respecting management of the plan, does not exercise any authority or control respecting management or disposition of the assets of the plan." Id. MetLife argues that the April 9, 2013, internal claim was generated automatically on White's behalf as a result of the determination of White's LTD claim. MetLife's representative testified that its policy is to generate such claims in all such cases. Keith argues that MetLife's actions exceeded the scope of its administrative or ministerial role.

The court finds that MetLife acted as a fiduciary by generating the internal claim for continuation of White's life benefits. In doing so MetLife acted in its discretion on behalf of a plan participant. MetLife presented no evidence that the plan documents required it to generate a claim on White's behalf or that it was otherwise operating within a framework of policies, interpretations, rules, practices and procedures made by other

-14-

persons. The evidence indicates that it was MetLife's own internal policy to generate continuation of life insurance claims upon determination of an LTD claim. MetLife appears to have taken a voluntary, discretionary action for the benefit of a Plan participant. By exercising its discretion to assist White in obtaining a potential benefit, MetLife acted as a fiduciary. MetLife therefore owed White a fiduciary duty to act in his best interest and to avoid misinforming him.[29]

## 2. Breach of Fiduciary Duties

MetLife owed White a statutory duty under ERISA to perform its duties with respect to a plan solely in White's interest and to do so with the care, skill, prudence, and diligence called for by the circumstances. It also owed White a duty to communicate with him in a manner calculated to avoid confusion and misunderstanding, and not to materially mislead him. The court finds that MetLife did not breach these fiduciary duties. The evidence establishes that MetLife was acting solely in White's interest by generating the claim for continuation of coverage. MetLife initiated the claims process on White's behalf to make a potential benefit available to him, notwithstanding that White was ultimately ineligible for the benefit described in MetLife's letters.

---

[29]The court has previously held that MetLife did not act as a fiduciary in other respects. Memorandum Opinion and Order, Docket Entry No. 48, pp. 10-11.

Although MetLife's actions could potentially have confused or misled White, sending the May 9th and May 21st letters did not constitute a breach of fiduciary duty because they contained no misinformation. When read in conjunction with the Plan documents, MetLife's letters did not misstate the circumstances regarding White's coverage or the status of the claim. When the letters were sent, White was still employed and his premiums were still being paid by Central Bank. The letters therefore accurately stated that no action was then required by White in order to maintain his coverage. And because MetLife was not the Plan Administrator, it owed no duty to provide White with notice of his options for maintaining coverage upon termination. The court therefore finds that MetLife did not breach any fiduciary duty to White.

3.   Harm/Detrimental Reliance

Even if MetLife had breached a fiduciary duty, the court finds that Keith has not proven that MetLife's actions were the cause of her alleged harm (i.e., the loss of benefits under White's life insurance policy). Keith must prove that, but for MetLife's actions, White would have maintained his life insurance policy. In effect, Keith must prove that White detrimentally relied on MetLife's letters in failing to take action to maintain his life insurance policy. Because premium payments were required during the 9-month waiting period before any determination of waiver eligibility would be made, Keith must prove that White would have made the payments had he known that he needed to do so.

The court finds credible Rogers' testimony that White told her he had no interest in maintaining the life insurance policy at his own expense. Rogers testified that she discussed White's option to maintain his life insurance policy after his termination with him during the exit interview on March 19, 2013. White replied that he had no interest in doing so, and Rogers therefore did not provide him with any further information or with the accompanying paperwork.

In addition to Rogers' testimony, circumstantial evidence supports a finding that White would not have maintained the policy at his own expense. White declined to participate in a number of employer-subsidized benefits, including a matching § 401(k) plan and supplemental insurance. White often failed to attend annual meetings at which benefits were discussed and often completed paperwork months later. Moreover, although White designated Keith as the beneficiary of his life insurance policy for several years, in 2012 he neglected to designate <u>any</u> beneficiary for the subsidized life insurance.

Although White was fond of Keith and wanted her to receive the benefit of his life insurance policy in the event of his death, the court finds that White would not have paid substantial life insurance premiums while on a fixed disability income without knowing how long he might need to do so.[30] Furthermore, Keith stood

---

[30]Evidence offered at trial shows that White's expected Social Security income was $1,797.10 for September of 2013 and $1,902.00 thereafter (Central Bank's Ex. 21). Evidence also showed that
(continued...)

to receive the balance of White's checking account upon his death, then valued at over $74,000. And Keith was, according to her testimony, self-sufficient. The court concludes that White would not have elected to deplete his limited resources indefinitely in exchange for a benefit that Keith did not need.

Even assuming that White did want to maintain the life insurance policy at his own expense, Keith has not proven by a preponderance of the evidence that he would have done so but for MetLife's letters. The evidence of White's ongoing interactions with Central Bank, MetLife, and other benefit providers shows that he was both willing and able to act to secure his desired benefits, as he did with his SSD and LTD benefits. White's duties at the bank involved interpreting complex financial documents, and there is no evidence of mental impairment at the time the letters were sent. If White had been confused by MetLife's letters, he could have contacted either Rogers or MetLife for clarification. The court finds that White did not detrimentally rely on the MetLife letters.

## B.    Central Bank

### 1.   Fiduciary Status

An employer, such as Central Bank, acts as an ERISA fiduciary to the extent that it acts in its capacity as plan administrator.

---

[30] (...continued)
White's premium payment would have been $448.93 per month, or over 20% of White's income. The only other asset identified that White could have used to pay the premiums was the checking account that he had designated payable on death to Keith.

Izzarelli v. Rexene Products Co., 24 F.3d 1506, 1524 (5th Cir. 1994) (quoting Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155, 1158 (3d Cir. 1990)). Central Bank, as Plan Administrator, acted in a fiduciary capacity through Rogers when she explained plan benefits to Central Bank employees, such as White. See Varity Corp. v. Howe, 116 S. Ct. 1065, 1071 (1996). Rogers therefore owed White a duty to communicate all material facts to White and to avoid misleading him during his exit interview.

The court also finds that Rogers acted as a fiduciary on behalf of Central Bank when she volunteered to serve as a liaison between White and MetLife. There is no evidence that Rogers' involvement was required by the Plan. Rogers' assistance was voluntary and motivated by a benevolent desire to assist White in light of his deteriorating physical condition. Plan administrators who gratuitously undertake to communicate with plan participants regarding plan benefits owe fiduciary duties when doing so. Cf. Switzer, 52 F.3d at 1298-99 (accepting the district court's reasoning that "when a plan administrator thus elects to act as a Good Samaritan and--without prior inquiry from the participant-- gratuitously communicate with a plan participant about such a matter, the administrator must do so in a manner calculated to avoid confusion and misunderstanding, whether by omission or commission"). Once Rogers intervened between White and MetLife, she owed White a duty to inform him of material information she obtained from MetLife.

-19-

2. <u>Breach of Fiduciary Duties</u>

Keith argues that (1) Central Bank did not fulfill its obligation to pay "up to 9 months" of premium payments after White began his leave, (2) Rogers failed to provide White with the required information about his options upon termination, and (3) Rogers failed to communicate to White the information she obtained in her May 28th phone call with MetLife.

Keith first argues that because White left work due to his illness, Central Bank was obligated under the terms of White's life insurance policy to pay his life insurance premiums for up to nine months after he ceased working. "When construing ERISA plan provisions, courts are to give the language of an insurance contract its ordinary and generally accepted meaning if such a meaning exists." <u>Provident Life & Accident Insurance Co. v. Sharpless</u>, 364 F.3d 634, 641 (5th Cir. 2004) (citations omitted). The provision in the policy on which Keith relies states in part:

> The Employer has elected to continue insurance by paying premiums for employees who cease Active Work in an eligible class for any of the reasons specified below. You will be notified by the Employer how much You will be required to contribute.
>
> Insurance will continue for the following periods:
>
> 1.   for the period You cease Active Work in an eligible class due to injury or Sickness, up to 9 months;
>
> .   .   .   .
>
> At the end of any of the continuation periods listed above, Your insurance will be affected as follows:

- if You resume Active Work in an eligible class at this time, You will continue to be insured under the Group Policy;

- if You do not resume Active Work in an eligible class at this time, Your employment will be considered to end and Your insurance will end in accordance with the DATE YOUR INSURANCE ENDS subsection of the section entitled ELIGIBILITY PROVISIONS: INSURANCE FOR YOU.[31]

Although the court agrees that White qualified for <u>up to</u> nine months of employer-paid premiums while on leave,[32] this provision no longer applied after White was terminated. The provision clearly deals with temporary absences from work. It refers to ceasing "Active Work." "Active Work" is defined in the policy as "performing all of the usual and customary duties of Your job on a Full-Time basis."[33] The policy further distinguishes between ceasing Active Work and ending employment. Moreover, the eligible categories of "continuation periods" involve temporary conditions including injury or sickness, layoffs, and leaves of absence. These "continuation periods" may end with either a return to Active Work or the end of employment.

White was initially entitled to a continuation period of <u>up to</u> nine months of employer-paid premiums because he ceased Active Work

---

[31]Certificate of Insurance, Plaintiff's Ex. 4, p. 30.

[32]The court finds that White left work due to illness. "Sickness" is a defined term including "illness." <u>Id.</u> at 23. White's ALS clearly qualifies, and because he ceased work due to ALS-related symptoms, White ceased work "due to . . . Sickness."

[33]<u>Id.</u> at 23.

due to sickness on March 7, 2013. But White's continuation period ended because of his termination on June 5, 2013. The policy states:

DATE YOUR INSURANCE ENDS

Your insurance will end on the earliest of:

. . .

3.   the end of the period for which the last premium has been paid for You; or

4.   for Basic Life Insurance, the last day of the calendar month in which Your employment ends; Your employment will end if You cease to be Actively at Work in any eligible class, except as stated in the section entitled CONTINUATION OF INSURANCE WITH PREMIUM PAYMENT . . .[34]

The policy states that insurance will end on the <u>earliest</u> of the dates listed. White was terminated on June 5, 2013. White's life insurance therefore ended no later than June 30, 2013, the last day of the calendar month in which his employment ended. After his employment ended White was no longer eligible for insurance under Central Bank's group life insurance policy.[35] The court concludes, as a matter of law, that Central Bank was not required under the terms of the policy to pay White's life insurance premium after he was terminated.

The court also finds that Central Bank met its fiduciary duty to inform White of his options upon termination. The court finds

_____

[34]Certificate of Insurance, Plaintiff's Ex. 4, p. 27.

[35]Under the terms of the policy, White would have had to maintain coverage at his own expense.

credible Rogers' testimony that she explained White's options to him in the March 19, 2013, exit interview. Rogers owed no duty to provide White with written notice of his life insurance options after he expressed no interest in maintaining life insurance benefits. As one court noted, in contrast to the statutory requirement that employers provide written notice to employees of their COBRA right to continue health coverage, no such statutory requirement applies to life insurance. <u>Prouty v. Hartford Life and Accident Insurance Co.</u>, 997 F. Supp. 2d 85, 90 (D. Mass. 2014). Nor did Rogers breach a fiduciary duty under the terms of the Plan. Although Plan documents indicate that the Plan Administrator should provide participants with a Notice of Right to Convert, Rogers was not obligated to do so in light of White's statement that he was not interested in continuing his life insurance after his employment was terminated and because White's options were explained in the Plan documents made available to all employees.

In support of Keith's arguments that Central Bank breached a fiduciary duty by failing to provide White with material information regarding his benefits, Keith relies on a decision from the Western District of Pennsylvania: <u>Erwood v. Life Insurance Company of North America</u>, Civil Action No. 14-1284, 2017 WL 1383922, at *1 (W.D. Pa. April 13, 2017). In the <u>Erwood</u> case, as here, an employer failed to provide written notice of the employee's right to convert his life insurance policy to an

individual policy or with the conversion forms with which to do so. At a meeting with the director of human resources and a benefits representative for life insurance and long-term disability, the employee showed signs of mental impairment, repeating the same question several times, and his wife was distraught. Id. at *3. The employee's wife repeatedly asked if their benefits and coverage would remain the same and received assurances from the director. Id. at *2-3. The employer provided the employee with an FMLA leave packet that did not include the information necessary to allow him to convert or continue coverage after the FMLA period. Id. at *3. While on leave, the employee's life insurance policy lapsed without his knowledge. Id. at *11. After the employee died, his wife's claim for death benefits under the policy was denied. Id. at *5. The court concluded that the employer violated 29 U.S.C. § 1132(a)(3) by failing to provide the employee with the information necessary to maintain his life insurance benefit and that the employee and his wife relied to their detriment on the employer's inadequate disclosures. Id. at *12-13.

Erwood, while both well-written and persuasive, is distinguishable. In Erwood the employer failed to make the employee or his wife aware of their options either orally or in writing. Here Rogers explained White's options to him in the exit interview and did not provide him with written notice based on his response. In Erwood the employee and his wife clearly expressed a

desire to have their insurance benefits remain in effect. White expressed no interest in doing so when given the option by Rogers at his exit interview.[36] The court in Erwood concluded that the inaction that led to the lapse of coverage could only be explained by a detrimental reliance on the employer's assurances. As this court has previously explained, there are other, more plausible explanations for White's inaction. Moreover, as the employer in Erwood was aware, the employee was mentally impaired and his wife was distraught. By all accounts White's cognitive faculties were unaffected by his illness, and he was actively involved in securing his disability and health benefits up until the time of his death. The court's holding in Erwood therefore does not support a finding that Rogers breached any fiduciary duty to White.

Rogers did not breach a fiduciary duty to White by failing to report to him the information she learned from MetLife regarding his eligibility to convert his policy. Rogers' communications with MetLife did not yield any new, material information. When Rogers contacted MetLife to gain a clearer understanding of the May 21st letter, she learned that White would need to convert his policy and pay premiums in order to be eligible for a waiver. Since White had

_____

[36]Keith argues that White's decision to continue with the same designated beneficiary is evidence of White's intent to maintain coverage. But maintaining Keith as beneficiary is only evidence that White intended to maintain the status quo, with Central Bank paying his premiums. White's election is not evidence that he would have maintained the policy at his own expense, and the court has found otherwise.

already informed Rogers that he had no interest in paying to maintain the life insurance policy, Rogers had no duty to advise him that his options were unchanged since his exit interview.

### 3. Harm/Detrimental Reliance

There are two potential causes of harm based on the alleged breaches by Central Bank. If Central Bank owed a duty to continue making payments on White's policy for nine months after he ceased Active Work, the bank's failure to do so was unquestionably harmful to Keith. The court has explained why it concludes that Central Bank owed no such duty.

The alleged harm as a result of Central Bank's miscommunication or of Central Bank's failure to communicate material facts is analogous to the issues raised by MetLife's letters. Even if Central Bank's actions had constituted a breach of fiduciary duty, the court finds that Keith has not proven that those actions were the cause of her alleged harm (i.e., the loss of benefits under White's life insurance policy). Keith must prove that but for Central Bank's actions White would have maintained his policy. Keith has failed to prove that Central Bank's actions caused her alleged harm for substantially the same reasons as stated in Section III.A.3. above. Based on Rogers' testimony and the evidence of White's previous benefits elections, the court finds that White knew he would have to pay for life insurance benefits after June of 2013 and that he chose not to do so.

## IV. Attorneys' Fees and Costs

Defendants seek an award of costs, and Central Bank also seeks attorneys' fees.[37] Keith objects to an award of attorneys' fees.[38]

## A. Applicable Law

The Federal Rules of Civil Procedure state that "[u]nless a federal statute, these rules, or a court order provides otherwise, costs--other than attorney's fees--should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1). ERISA provides that "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). "The Fifth Circuit has held that an award of costs in an ERISA case is limited to those listed in 28 U.S.C. § 1920." Humphrey v. United Way of Texas Gulf Coast, 802 F. Supp. 2d 847, 868 (S.D. Tex. 2011) (citing Cook Children's Medical Center v. New England PPO Plan of General Consolidated Management, Inc., 491 F.3d 266, 275-76 (5th Cir. 2007), cert. denied, 552 U.S. 1180, 128 S. Ct. 1223, 170 L.Ed.2d 60 (2008)).

The United States Supreme Court has held that "a court 'in its discretion' may award fees and costs 'to either party,' as long as

---

[37]Defendant Metropolitan Life Insurance Company's Motion for Costs and Brief in Support, Docket Entry No. 71; Defendants Central Bank and Central Bank Welfare Benefit Plan's Motion for Recovery of Attorneys' Fees and Costs and Brief in Support, Docket Entry No. 72; Defendant Metropolitan Life Insurance Company's Supplement to Its Motion for Costs, Docket Entry No. 74.

[38]Plaintiff's Response to Defendant Central Bank and Central Bank Welfare Benefit Plan's Motion for Recovery of Attorney's Fees and Costs and Brief in Support, Docket Entry No. 73.

the fee claimant has achieved 'some degree of success on the merits.'" Hardt v. Reliance Standard Life Insurance Co., 130 S. Ct. 2149, 2152 (2010) (citation omitted). The Fifth Circuit established a five-factor test for deciding whether to award attorneys' fees under § 1132(g)(1) in Iron Workers Local No. 272 v. Bowen, 624 F.2d 1255, 1266 (5th Cir. 1980). Since the Supreme Court's decision in Hardt, the Fifth Circuit has held that the Bowen test is no longer mandatory. See, e.g., LifeCare Management Services LLC v. Insurance Management Administrators Inc., 703 F.3d 835, 846-47 (5th Cir. 2013); 1 Lincoln Financial Co. v. Metropolitan Life Insurance Co., 428 F. App'x 394, 396 (5th Cir. 2011) (per curiam) (unpublished). The court nevertheless finds those factors helpful:

> In deciding whether to award attorneys' fees to a party under section 502(g), therefore, a court should consider such factors as the following: (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions.

Bowen, 624 F.2d at 1266 (5th Cir. 1980) (citations omitted).

B. **Analysis**

1. Costs

The court finds that neither defendant breached a fiduciary duty to Keith and that neither defendant's actions caused Keith's

alleged harm. Each of the defendants therefore achieved some degree of success on the merits. The court therefore concludes that an award of defendants' costs is appropriate.[39]

### 2. Attorneys' Fees

At the conclusion of trial the court expressed its tentative position that no attorneys' fees would be awarded in this case. Nothing has since persuaded the court to change its view. This dispute involved close questions that were well-suited to a trial on the merits. The result reached by the court was not a foregone conclusion.

Under the Bowen factors, the court would reach the same conclusion. There is no culpability or bad faith on the part of Keith in bringing this action. Had the court not concluded at the summary judgment stage that a reasonable factfinder could find in favor of Keith, there would have been no trial. Although the court has no specific evidence as to whether Keith is able to satisfy an award, even Central Bank's reduced fee request of $34,164.86 would represent a substantial sum to many retirees. Furthermore, although awarding fees might well deter would-be litigants in Keith's position, no such deterrence is warranted. Keith did not bring a meritless action. Turning to the fourth factor, the

---

[39]Each of the defendants has submitted a Bill of Costs and MetLife has submitted further documentation in support of the costs sought. These submissions are premature. Local Rule 54.2 states, in part: "An application for costs shall be made by filing a bill of costs within 14 days of the entry of a final judgment."

resolution of this case did not bring a substantial benefit to all plan participants or resolve a significant question regarding ERISA itself. Finally, regarding the relative merits of the parties' positions, the court notes that it took a trial during which the court repeatedly questioned all parties, and the court's ultimate resolution of disputed facts and murky law, to bring this matter to its conclusion. The court concludes that no award of attorneys' fees is warranted in this case.

## V. <u>Conclusion</u>[40]

If any finding of fact should more properly be characterized as a conclusion of law, it is hereby adopted as a conclusion of law. If any conclusion of law should more properly be characterized as a finding of fact, it is hereby adopted as a finding of fact.

Based on the evidence, the court's credibility determinations, and the court's analysis, the court holds that Keith is not entitled to relief under 29 U.S.C. § 1132(a)(3). The court finds that defendants did not breach any fiduciary duty to White or Keith. Furthermore, if either defendant breached a fiduciary duty to White or Keith, the court finds that Keith provided no evidence

---

[40]The fact that the court has not expressly addressed in this Memorandum Opinion and Order any other arguments the parties may have made reflects the court's conclusion that they lacked merit and/or that the party asserting the argument failed to prove it at trial.

that the alleged harm -- the loss of benefits -- was the result of MetLife's action or Central Bank's inaction.

Consistent with the court's holding and findings, the court will enter a final judgment that Keith take nothing from either defendant. No attorneys' fees will be awarded. Costs will be taxed against Keith.

**SIGNED** at Houston, Texas, on this the 9th day of June, 2017.

_____

SIM LAKE
UNITED STATES DISTRICT JUDGE